NASHVILLE (Case No. 10,023)                                   [17 Fed. Cas. page 1176]

NASH (UNITED STATES v.). See Case No. 15,856.

NASH (WESTON v.). See Case No. 17,454.

## Case No. 10,023.
### The NASHVILLE.
[4 Biss. 188.] [1]

District Court, D. Indiana. May, 1868.

SHIPPING—PUBLIC REGULATIONS—PENALTY—HOW RECOVERED—REVENUE LAWS.

1. A prosecution for a penalty under the third section of the act of July 4, 1864 [13 Stat. 390], regulating the carriage of passengers on steamships, &c., must be by action of debt, and not a libel in rem.

2. Revenue laws are those laws only whose principal object is the raising of revenue, and not those under which revenue may incidentally arise

In admiralty.

Alfred Kilgore, U. S. Dist. Atty., and C. E. Marsh, for the United States.

Hanna & Knefler, for defendants.

McDONALD, District Judge. The libel in this case was filed by the United States on the 27th of September, 1867. It charges that on the 3rd of August, 1867, at Evansville, Indiana, a port of delivery, the steamboat Nashville, being subject to enrollment and license under the laws of the United States, and engaged in navigating the Ohio river along the shores of Indiana, and carrying cabin and steerage passengers for hire, and being wholly propelled by steam, and being temporarily moored at the Indiana shore in that city, while in the regular course of a voyage on said river, violated the revenue laws of the United States, by her master and owners then and there failing and neglecting "to place or keep in any conspicuous place in said vessel a duly certified copy of the paper or document required by law to be placed and kept, and known as the inspector's certificate, and described as such, and defined also by sections 9 and 25 of the act of congress entitled 'An act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam, and for other purposes,' approved August 30, 1852, in a place where such copy of said certificate would have been most like-

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

ly to be seen by the steerage passengers of said vessel."

The libel claims, that, by reason of said facts, the steamer is subject to a penalty of one hundred dollars, and is liable to be seized, summarily proceeded against, and holden for the payment of that sum. And it prays that a warrant for the arrest of the boat issue accordingly, &c.

On the filing of the libel, a warrant was issued on which the marshal seized the steamer, and held her till the owner obtained a re-delivery of her by executing a bond under the provisions of the act of March 3, 1847 (9 Stat. 181).

The owner of the boat now appears, and demurs to the libel. In support of the demurrer it is argued that the present proceeding is fatally defective, as being a libel in rem, whereas it should have been an action of debt. Whether this objection is valid, must depend on the act of congress on which the proceeding is founded.

The act on which the libel is framed is that of July 4, 1864 (13 Stat. 390). The third section of that act provides, "that hereafter there shall be delivered to masters or owners of vessels three copies of the inspector's certificates, directed to be given them by collectors or other chief officers of the customs by the 25th section of the act entitled 'An act to amend an act entitled "An act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam; and for other purposes," ' approved August 30, 1852, one of which copies shall be placed, and at all times kept, by said masters or owners, in some conspicuous place in the vessel, where it will be most likely to be discovered by steerage passengers, and the others as now provided by law; and the penalty for neglecting or refusing to place and keep up such additional copy shall be the same as is provided by the said 25th section in the other cases therein mentioned."

The twenty-fifth section referred to in the section above cited is as follows:

"That the collector or other chief officer of the customs shall retain on file all original certificates of the inspectors required by this act to be delivered to him, and shall give to the master or owner of the vessel therein named, two certified copies thereof, one of which shall be placed by such master or owner in some conspicuous place in the vessel, where it will be most likely to be observed by passengers and others, and there kept at all times; the other shall be retained by such master or owner, as evidence of the authority thereby conferred; and if any person shall receive or carry any passenger on board any such steamer not having a certified copy of the certificate of approval, as required by this act, placed and kept as aforesaid; or who shall receive or carry any gunpowder, oil of turpentine, oil of vitriol, camphene, or other explosive burning fluids, or materials which ignite by friction, as freight, on board any steamer carrying passengers, not having a certificate authorizing the same, and a certified copy thereof placed and kept as aforesaid; or who shall stow or carry any of said articles at a place or in a manner not authorized by such certificate, shall forfeit and pay for each offense one hundred dollars, to be recovered by action of debt in any court of competent jurisdiction." 10 Stat. 71.

The inspector's certificate referred to in the sections above cited is a certificate of the seaworthiness of the vessel, and by the ninth section of the act last aforesaid, is required to be annually obtained. 10 Stat. 63–65.

If we consider the two sections above copied separately from all other legislation on the subject, I think that we must draw from them the following deductions:

First. That both of them contemplate a personal penalty and judgment, and not a judgment in rem. The twenty-fifth section expressly declares that the recovery shall be "by an action of debt." It is singular enough that the verbs—"shall forfeit and pay"—in the twenty-fifth section, have grammatically no nominative. Whether the "master or owner," or the "steamer" shall forfeit and pay, is not expressed. So, the third section—the section on which this prosecution is founded—does not in terms declare who shall pay the penalty. It merely says, that "the penalty for neglecting and refusing to place and keep up such additional copy shall be the same as is provided by said 25th section." But I think it very plain that the twenty-fifth section intends that the master or owner shall incur the penalty, and not the steamer; and that the construction of the third section must, in this respect, follow that of the twenty-fifth.

Secondly. By the twenty-fifth section it is perfectly clear that the action must be in debt and not in rem; and, as the third section provides that the penalty "shall be the same as is provided by the said twenty-fifth section," I think it a fair deduction that the form of action shall also be the same. It is true that the section does not say that the form of action shall be the same, but only that the penalty shall be the same. But, as the third section does not expressly say anything about a form of action, and as, upon general principles, where a statute creates a penalty and fixes the amount, debt will lie for it; it seems to me fair to conclude that congress, as these two statutes are in pari materia, meant to give the same form of action in relation to both. I think, therefore, that, if no other act of congress controls this question, debt will lie for penalty under consideration. For, "if a statute prohibit the doing of an act under a penalty of forfeiture * * * and do not prescribe any mode of recovery, it may be recovered in this form of action." 1 Chit. Pl. 101. In this case, how-

ever, taking the two sections in question together, and irrespective of any other act, I think that these sections do prescribe the action of debt. And, if so, then the rule will apply that when a statute creates a penalty and prescribes a remedy, that remedy alone can be pursued. Stevens v. Evans, 2 Burrows, 1152.

It is insisted, in support of the libel, that the eighth section of the act of July 18, 1866 (14 Stat. 180), authorizes an action in rem in the present case. That section provides, "that in any case where a vessel, or the owner, master, or manager of a vessel, shall be subject to a penalty for a violation of the revenue laws of the United States, such vessel shall be holden for the payment of such penalty, and may be seized and proceeded against summarily by libel to recover such penalty, in any district court of the United States having jurisdiction of the offense."

This section is decisive of the regularity of the present proceeding, if the offense charged in the libel is "a violation of the revenue laws of the United States." But is the third section of the act of July 4, 1864, a "revenue law" within the meaning of said eighth section?

The act of July 18, 1866, is undoubtedly a revenue law. But that is not the question. The question relates to the act of July 4, 1864, and especially to its third section on which this libel is founded. It is certain that this third section makes no provision whatever touching revenue. The act itself is entitled "An act further to regulate the carriage of passengers in steamships and other vessels." And, consisting of 10 sections, it contains no provision of any kind concerning revenue. The act, indeed, refers to and amends various sections of prior acts, found in 5 Stat. 306; 10 Stat. 71, 715, 719. But not one of these sections relates to the United States revenue, nor do the acts in which they are found. On the contrary, all these acts concern the protection of the lives of passengers on steamers.

Bouvier, in his Law Dictionary, defines revenue to be "the income of the government arising from taxation, duties, and the like." "Revenue laws" within the meaning of the section above cited from the act of July 18, 1866, should, then, mean laws relating to the income of the government, arising from taxation, duties, and the like.

The seventh section of the first article of the national constitution provides that "all bills for raising revenue shall originate in the house of representatives." I suppose that "bills for raising revenue" are, when passed, "revenue laws" within the meaning of the eighth section of the act of July 14, 1866. It may, therefore, throw light on the question under consideration to ascertain what has been the construction of said constitutional provision. It is certain that the practical construction of this provision by congress has been to confine its operation to bills the direct and principal object of which has been to raise revenue, and not as including bills out of which money may incidentally go into the treasury, or revenue incidentally arise.

What bills are properly "bills for raising revenue," in the sense of the constitution, has been matter of some discussion. A learned commentator (Tucker) supposes that every bill, which indirectly or consequentially may raise revenue, is, within the sense of the constitution, a revenue bill. He therefore thinks, that the bills for establishing the post office, and the mint, and regulating the value of foreign coin, belong to this class, and ought not to have originated (as in fact they did) in the senate. But the practical construction of the constitution has been against this opinion. And, indeed, the history of the origin of the power, already suggested, abundantly proves, that it has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes, which may incidentally create revenue. No one supposes that a bill to sell any of the public lands, or to sell public stock, is a bill to raise revenue, in the sense of the constitution. Much less would a bill be so deemed which merely regulated the value of foreign or domestic coin, or authorized the discharge of insolvent debtors upon assignment of their estates to the United States, giving a priority of payment to the United States in case of insolvency, although all of them might incidentally bring revenue into the treasury. Story, Const. § 880.

Counsel for the libel argue that all acts of congress regulating commerce, and navigation, and the carriage of passengers by water, are revenue laws, as they all, more or less, incidentally touch the interests of the United States treasury. And so they hold that, since by an act of congress the master or owner of a steamer must pay a certain sum of money for the inspector's certificate already alluded to, which money goes into the treasury, and since the gist of this action is the failure to put up in a certain place in the steamer Nashville a copy of that certificate; and since a part or the whole of the penalty sued for in this case will, if recovered, go into the treasury; therefore the law creating the penalty is a revenue law. But I cannot assent to this logic. I think it is too subtle. The thread of the argument is "long drawn out" and very attenuated. To me it appears that the obvious meaning and common sense of the thing is that the eighth section of the act of July 18, 1866, in employing the phrase, "revenue laws," intended those laws—and those only—which upon their face are plainly designed to raise revenue. The act on which this libel is founded was evidently not passed with any such design. Its sole design clearly was the protection of the persons and lives of steamboat and steamship passengers.

Many other questions have been raised on the argument of this demurrer. But the conclusion above arrived at renders a notice of them unnecessary. I am of opinion that the action in this case ought to have been debt; that a libel in rem does not lie in it; and that the libel must be quashed and the suit dismissed.